UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

---

LAWRENCE D'ADDARIO, suing individually
and derivatively on behalf of RMS TITANIC, INC.,

    Plaintiff,

Case No. 2:02cv250 (RBS)

v.

ARNIE GELLER, STEVEN COUTURE, as Executor of
the Estate of Gerald Couture, and RMS TITANIC, INC.,

    Defendants.

---

## SETTLEMENT AGREEMENT

Plaintiff Lawrence D'Addario ("Plaintiff"), on the one hand, and defendants Arnie Geller, Steven Couture, as Executor of the Estate of Gerald Couture, and R.M.S. Titanic, Inc. (collectively, Defendants), on the other hand, enter into this agreement ("Settlement Agreement") contingent upon the occurrence of the events described in Paragraph 1 below:

WHEREAS, after three and a half years of litigation, the parties resolve to amicably settle this litigation in an effort to avoid or reduce any further expense associated with the continued litigation over the matters raised in the complaints filed in the above-captioned matter in April 2002 and filed in the action styled *Shuttle v. Geller*, Case No. 8:03CV2515-T-26(MAP) (the "Class Action") in November 2003, pending in the United States District Court for the Middle District of Florida;

**EXHIBIT A**

NOW, THEREFORE, IT IS AGREED by the undersigned parties, in consideration of the mutual undertakings contained herein and for other valuable consideration, the sufficiency of which is hereby acknowledged, that:

1. In addition to paragraphs 3 and 4 below, the terms of this Settlement Agreement are contingent upon each and every of the following events: (1) the United States District Court for the Eastern District of Virginia's (the "Virginia Court") approval of this Settlement Agreement in the above-styled action (the "Derivative Action") after a fairness hearing as contemplated by Rule 23.1 of the Federal Rules of Civil Procedure; (2) the Virginia Court's approval of the method and contents of the notice of this Settlement Agreement to RMST's shareholders; (3) the entry of final judgment by the Virginia Court; (4) the United States District Court for the Middle District of Florida's (the "Florida Court") approval of this Settlement Agreement and notice after a fairness hearing as contemplated by Rule 23(e) of the Federal Rules of Civil Procedure, in the Class Action; and (5) the entry of final judgment by the Florida Court;

2. The Corporate Governance Plan, attached hereto as Exhibit A, is hereby incorporated by reference and shall be deemed part of this Settlement Agreement;

3. Upon the occurrence of the events described in paragraph 1 above, defendants shall pay $300,000 to plaintiff's counsel, Storch Amini & Munves PC ("SAM"), in settlement of all fees and costs incurred by SAM; Brydges, Geroe, Rosenblatt & O'Brien, PLLC; Bales & Sommers, P.A. (collectively, "D'Addario and Shuttle Counsel"); and plaintiff's out-of-pocket expenses. Defendants must pay

this fee within 5 (five) business days of the occurrence of the events described in paragraph 1 above. Failure of Defendants to pay D'Addario and Shuttle Counsels' fee shall be deemed a breach of this Settlement Agreement.

4. Upon the occurrence of the events described in paragraphs 1 and 3 above, the parties shall execute mutual releases arising from the claims asserted in the Derivative Action and Class Action, respectively. Notwithstanding the issuance of releases, nothing herein shall be construed to prevent a party from seeking injunctive relief to enforce the terms of this Settlement Agreement, as provided in the Corporate Governance Plan.

5. Upon the occurrence of the events described in paragraphs 1, 3 and 4 above, all parties agree to be bound by the terms of this Settlement Agreement.

6. All parties agree to use reasonable efforts to seek approval of this Settlement Agreement from both the Virginia Court and the Florida Court.

7. This Settlement Agreement and all disputes arising under this Settlement Agreement shall be governed by the laws of the State of Florida, without regard to its conflict of laws principles.

8. The failure of any party to this Settlement Agreement to object to, or to take affirmative action with respect to, any conduct of any other party which is in violation of the terms of this Settlement Agreement shall not be construed as a waiver of the violation or breach of any future violation, breach or wrongful conduct. All waivers must be in writing by the party purporting to have waived any right or benefit hereunder, and no single waiver shall constitute any future waiver with respect to any terms of this Settlement Agreement.

9. None of the signatories hereto or their counsel shall be considered to be the drafter hereof or any provision hereof for the purpose of any statute, case law or rule of interpretation or construction that would or might cause any provision to be construed against the drafter hereof.

10. The undersigned parties mutually warrant that no promise or inducement has been offered to any of them relating to the subject matters of this Settlement Agreement, other than as stated herein, and that this Settlement Agreement is executed without reliance upon any statement or representations by any of the parties released herein or their representatives, agents or attorneys. This Settlement Agreement constitutes the entire agreement between the parties hereto relating to the subject matter of this Settlement Agreement and there are no agreements, undertakings or conditions between such parties that are not stated therein.

11. No provision of this Settlement Agreement creates any right on the part of or is enforceable by any person or entity that is not a signatory to this Settlement Agreement. There are no third-party beneficiaries to this Settlement Agreement.

12. The Settlement Agreement cannot be altered or amended absent the written consent of the parties hereto and/or their successors or assigns.

13. This Settlement shall be binding upon and inure to the benefit of the parties hereto and their respective successors or assigns.

14. The parties have read this Settlement Agreement and have consulted with and received the advice of competent counsel before entering into this Settlement Agreement.

15. The undersigned represent and warrant that they are authorized to execute this Settlement Agreement on behalf of their respective entities.

16. This Settlement Agreement may be executed in any number of counterparts, in either original or facsimile form, each of which will be deemed to be an original, and all of which when taken together will constitute a single instrument. This Settlement Agreement shall not be binding until signed by all parties.

**AGREED TO AND ACCEPTED BY:**

Lawrence D'Addario: _____    Date: _____

Arnie Geller: _____    Date: _____

Steven Couture, as Executor
Of the Estate of Gerald Couture    _____    Date: _____

R.M.S. Titanic, Inc.    _____    Date: _____
   By:
   Title:

Premier Exhibitions, Inc.    _____    Date: _____
   By:
   Title:

# PREMIER EXHIBITIONS INC. and RMS TITANIC, INC.
# CORPORATE GOVERNANCE PLAN

## I. ADOPTION AND AMENDMENT

A. This corporate governance plan ("Corporate Governance Plan" or the "Plan") shall be adopted by RMS Titanic, Inc. ("Titanic") and Premier Exhibitions, Inc. (collectively, the "Company") pursuant to a stipulation of settlement among all parties to the action captioned *D'Addario v. Geller*, Case No. 2:02CV250(RBS) (the "Action") upon approval thereof by the United States District Court for the Eastern District of Virginia, Norfolk Division (the "Court") and *Shuttle v. Geller*, Case No. 8:03CV2515-T-26(MAP) in the United States District Court for the Middle District of Florida, Tampa Division (the "Florida Class Action").

B. The Corporate Governance Plan shall be adopted and effective only upon both: (1) final approval by the Court of settlement of the Action as referenced above, and (2) final approval of the District Court of the Middle District of Florida of the settlement of the Florida Class Action as referenced above. This Corporate Governance Plan shall have a term of five years from the date it is adopted and may be amended from time-to-time. An amendment to this Corporate Governance Plan, other than an amendment resulting solely from a change in law or regulation or listing standard, shall be effective only upon satisfaction of the following procedure:

1. The proposed amendment must be recommended to the Independent Directors, as defined in Section II, below, by a vote of a majority of the members of the Corporate Governance Committee, as defined in Section III, below;

2. Any proposed amendment must then be approved by a vote of a majority of the Independent Directors;

3. For a period of three (3) years from the date of approval by the Court of the settlement of the Action, the Company shall provide notice of any proposed amendment to this Plan to counsel for the Derivative Plaintiff.

## II. CORPORATE CONTROL AND COMPLIANCE

A. There shall be a Director of Internal Audit or an external auditor. The Director of Internal Audit or external auditor shall be responsible for examining and evaluating the adequacy and effectiveness of the Company's internal control procedures. This shall include analysis of the Company's computerized information system and security as well as other issues consistent with responsibility for maintaining the Company's internal controls.

B. The Board shall, at all times, have at least the following committees: an Audit Committee and a Corporate Governance Committee, each as described in Sections V and VI below

1

## III. COMPOSITION OF NOMINEES TO THE BOARD

A. Independence

1. The incumbent Board shall propose five (5) nominees to the Board such that, should the Company's shareholders elect the nominees proposed by the Board, three (3) members of the Board shall be independent directors, within the meaning of the Securities Exchange Act, and as defined below in this Section.

2. Any shareholder of the Company shall have the right to nominate two (2) of the independent directors and be given reasonable opportunity to do so.

3. The Board will modify its by-laws for the nomination of Independent Directors by shareholders, giving due consideration to sufficient notice by the Company to shareholders of the date of the meeting, and shall make such amended by-laws publicly available to the shareholders. An "Independent Director" shall be defined by the applicable SEC definition, or in the event that the Company secures a NASDAQ or AMEX listing, the applicable NASDAQ or AMEX rule(s) shall govern.

In the event of any conflict between the SEC's definition of independent director (or the NASDAQ or AMEX rules, if applicable) and the definition contained herein, the SEC definition shall prevail. If a person has one or more of the relationships described in any of the SEC rules or applicable AMEX or NASDAQ regulations, that person is not an Independent Director, unless the Corporate Governance Committee recommends and the Board of Directors approves the recommendation affirmatively determining that such relationship or relationships are not material. Any such determination and the bases therefore shall be disclosed in the Company's annual proxy statement.

5. Should any Independent Director learn of changes to the information used to determine independence set forth in Section III A above, such Director as soon as practicable shall notify the Corporate Secretary, in writing, of the relevant information. Such information shall be provided to the Corporate Governance Committee to determine what action, if any, is required. Any such determination and the bases therefore shall be disclosed in the Company's annual proxy statement.

B. The Independent Directors

1. The non-management directors, including the Independent Directors, shall meet as a group in executive session, without the Chief Executive Officer or any other non-Independent Director, at least two (2) times in each calendar year.

2

   2.  The Independent Directors shall be entitled, acting as a group by vote of a majority of such Independent Directors, to retain legal counsel, accountants, industry consultants, or other experts, at the Company's expense, said expenses to be reasonable and customary, to advise the Independent Directors concerning issues arising in the exercise of their functions and powers consistent with the charters of the various Board Committees and in such other circumstances as the Board shall approve from time to time.

   3.  The entire board shall determine whether the offices of Chairman of the Board and Chief Executive Officer shall be held by separate individuals.

   4.  The Corporate Governance Committee, comprised of three (3) members, two (2) of whom shall be Independent Directors, shall consider objective and subjective performance criteria to be established within their discretion for the Board's evaluation of the Chief Executive Officer's performance. At least annually, the Corporate Governance Committee will evaluate the Chief Executive Officer's performance in light of its established goals and objectives and shall cause the Chairman to communicate the results to the Chief Executive Officer and the Board. In connection with this responsibility, the Corporate Governance Committee shall have access to advisors who are independent from management.

C.  Director Compensation

Director compensation shall be considered by the Directors annually and may consist of a combination of cash and the Company's common stock. Director compensation, including any compensation for committee services, shall be the only compensation Independent Directors serving on the Audit Committee members receive from the Company.

D.  Director Election

The Board shall be classified as follows:

   a)  Two (2) non-independent directors shall remain and stand for election in calendar year 2006 to a one-year term.

   b)  The three (3) Independent Directors to be elected in calendar year 2006 will be elected to one-year terms.

   c)  On all matters each share of common stock has one vote.

## IV. DIRECTOR CHARACTERISTICS

A. Board Membership Criteria

1. The Corporate Governance Committee of the Board, comprised entirely of three (3) members, two (2) of whom shall be Independent Directors, shall meet separately and annually assess the size and composition of the Board in light of the operating requirements of the Company and the current makeup of the Board.

2. Assessment of membership qualifications for the Board of Directors and all Board committees should include, at a minimum, issues of diversity, age, background and training, business or administrative experience and skills, dedication and commitment, business judgment, analytical skills, and problem solving abilities.

3. The Corporate Governance Committee shall use these criteria, among others, if applicable, to evaluate the potential nominees to the Board. Such evaluations, among other factors, shall provide the basis for the Committee's recommendation of Directors to the Company's Board.

B. Core Competencies

1. While it is not necessary that each Director possess all Core Competencies described herein, each Director shall contribute some knowledge, experience, or skill in at least one domain that is important to the Company.

2. Such Directors shall possess experience in one or more of the following:

    a. Management or senior leadership position which demonstrates significant business or administrative experience and skills;

    b. Accounting or finance;

    c. Other significant and relevant areas deemed by the Corporate Governance Committee to be valuable to the Company.

C. Re-nomination of Directors

1. In re-nominating Directors, the Corporate Governance Committee shall consider the Board Membership Criteria described in subsection A. of this Section, as well as the Core Competencies, as described in subsection B. of this Section.

2. Prior to accepting re-nomination, a Director also should be asked to evaluate for himself or herself whether he or she satisfies the Board Membership Criteria and Core Competencies set forth herein in Sections IV A and B, respectively, of this Plan.

4

## V. BOARD PROCESSES AND EVALUATION

A. The Board and Company Executive Officers

1. In accordance with the provisions of Sarbanes-Oxley and any applicable exchange's rules and/or regulations, the Corporate Governance Committee, as comprised in paragraph IV(A)(1), Directors, shall, at least annually, evaluate, and make a recommendation to the Board regarding the performance of the Chief Executive Officer. The Board will, if necessary, replace the Chief Executive Officer.

2. The Board shall, at least annually, consider a Chief Executive Officer succession plan and receive periodic reports from appropriate executive officers on the development of other members of the Company's senior management.

3. The Board shall cause the Company, at least annually, to evaluate and, if necessary, recommend the appointment or replacement of the Director of Internal Audit in the event of such recommendation by the External Auditor.

4. The Corporate Governance Committee shall review and make recommendations to the Board regarding certain senior-level officers' compensation, including, at minimum the five highest paid officers in the Company.

5. All Directors shall have access to Company senior executive officers employed in policy-making capacities.

6. In accordance with its fiduciary responsibilities, the Board shall review and, where appropriate, approve the major financial commitments and other major corporate strategic plans of the Company, as defined whereby no less than 10% of corporate revenue, assets or expenses will be involved in such commitments or plans.

B. Internal Control and Corporate Compliance

The Audit Committee, consisting exclusively of Independent Directors, shall have oversight responsibility for internal control and corporate compliance. In particular, the Audit Committee, shall have a charter that provides, in addition to any requirements that may be required from a regulatory perspective, as set forth below:

1. Review the components of internal control including control environment, risk assessment, control activities, information and communication, and

monitoring -- to determine that such components are designed to ensure reasonable systems to provide:

   a.   Adequate financial reporting; and

   b.   Compliance with corporate policies and legal and regulatory requirements.

2. Oversee internal control systems and corporate compliance programs, including the creation, distribution and/or implementation of:

   a.   A code of business conduct based upon corporate policies and legal and regulatory requirements;

   b.   Procedures for monitoring compliance with that code; and

   c.   Methods for disseminating information regarding such programs.

3. The Audit Committee charter shall provide that, if the Audit Committee becomes aware of any significant deficiency from corporate compliance programs or internal control programs, or of material violations of established corporate policies or legal and regulatory requirements, it shall:

   a.   Reasonably determine that all appropriate corrective actions have been taken in response thereto;

   b.   Review any management override (which shall not include waivers permitted by policies or procedures) of corporate compliance programs and internal control programs, and take the steps necessary to reasonably determine that such action or override will not occur in the future without Board approval; and

   c.   Review the process for reporting deficiencies in the Company's internal control structure or violations of corporate compliance polices to reasonably assure that the Director of Internal Audit is informed of any such deficiencies or violations.

4. The Audit Committee charter shall provide that the Audit Committee review corrective actions taken by the Company when significant internal control or corporate compliance problems are reported to reasonably determine that such actions are sufficient under the circumstances.

5. The Audit Committee charter shall provide that the Audit Committee require and review periodic evaluations of the Company's internal control and corporate compliance structures to reasonably determine, at a minimum, that:

6

    a.    components of the Company's internal control and corporate compliance structures are regularly evaluated;

    b.    such evaluations are performed by qualified personnel; and

    c.    such evaluations have reasonable scope and depth of coverage and are conducted with sufficient frequency.

6    The Audit Committee charter shall provide that the Audit Committee review the Company's internal audit function, including:

    a.    The charter of the internal audit function, to reasonably assure that it is consistent with that recommended by the Institute of Internal Auditors; and

    b.    The resources provided to the internal audit group shall be reasonable and customary to assure that the internal audit group has sufficient resources to carry out its responsibilities.

7    The Audit Committee charter shall provide that the Audit Committee ensure that the Company's internal controls and the functioning of the internal controls comply with applicable law, including the Sarbanes-Oxley Act of 2002.

8    The Audit Committee charter shall provide that the Audit Committee shall have oversight responsibility for regulatory compliance. In particular, it shall:

    a.    Review the Company's Code of Business Conduct to determine that it is designed to provide adequate protection against violations of applicable laws and regulations; and

    b.    Review the record keeping and reporting systems to measure and monitor regulatory compliance requirements.

C.    Board Committees

The Board shall maintain an Audit Committee and a Corporate Governance Committee.

1.    The Audit Committee shall (a) be comprised of at least three members, each of whom is Independent, at least one member of which shall have financial expertise, and (b) support the oversight function of the Board by reviewing on a periodic basis the Company's procedures for preparing financial statements, its internal controls, and the independence of the Company's external auditor. The Audit Committee shall:

    a.    Meet at least 2 times per year;

b    Review the Company's internal audit functions at least annually;

c.    Have authority to recommend to the Board the firm to be employed as the Company's external auditor, and to recommend the discharge of any such firm, such fees to be reasonable and customary. Such retained firm:

    (1)    In accordance with applicable rules and regulations, shall be prohibited from providing to the Company any of the following non-audit services:

        (a)    bookkeeping or other services related to the accounting records or financial statements of the Company;

        (b)    financial information systems design and implementation;

        (c)    appraisal or valuation services, fairness opinions, or contribution-in-kind reports;

        (d)    actuarial services;

        (e)    internal audit outsourcing services;

        (f)    management functions or human resources, broker or dealer, investment Adviser;

        (g)    investment banking services;

        (h)    legal services and expert services unrelated to the audit; or

        (i)    any other service that the Audit Committee determines is impermissible, poses a potential conflict, or ought to be prohibited; and

    (2)    In accordance with applicable rules and regulations, shall obtain approval from the Audit Committee prior to performing any non-audit service, including tax services, that is not described in any of paragraphs (a) through (i) of subsection (1) above; except, however, that such firm may prepare or review income tax forms, registration statements and cost reports without such pre-approval; and

  (3) Shall have its lead audit partner rotated consistent with the requirement of Sarbanes-Oxley, and shall, consistent with the requirements of Sarbanes-Oxley, be subject to consideration by the Audit Committee of whether it would be appropriate for the Company to implement a regular rotation of the independent auditor firm.

d. In accordance with applicable rules and regulations, obtain and review, at least annually, a report by the Company's external auditor describing: that firm's disclosures, controls and procedures; any material issues raised by the most recent disclosures, controls and procedures or from any review or peer review of the firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues; and (to assess the auditor's independence) all relationships between the auditor and the Company;

e. Establish hiring policies for employees or former employees of the Company's independent auditors that comply with all applicable laws and regulations;

f. Review the external auditor's compensation, the proposed term of its engagement, and its independence;

g. Serve as a channel of communication between the external auditor and the Board, and between the Director of Internal Audit and the Board;

h. Have full access to all Company books and personnel;

i. Discuss separately with management and the Company's external auditor prior to the filing of each Form 10-K and each Form 10-Q as necessary, among other things, the appropriateness of the Company's accounting policies;

j. Meet, without the presence of any Company employees, at least annually with the Company's external auditor to review the results of each external audit of the Company, the report of the audit, any related management letter, management's responses to recommendations made by the external auditor in connection with the audit, all significant reports of the internal auditing department, and management's responses to those reports;

k. Review the Company's annual financial statements, any certification, report, opinion, or review rendered by the external auditor in

    connection with those financial statements, and any significant disputes between management and the external auditor that arose in connection with the preparation of those financial statements;

l. Consider, in consultation with the external auditor and the Director of Internal Audit, the adequacy of the Company's internal controls and compliance with the requirements of the Sarbanes-Oxley Act of 2002; and

m. Consider major changes and other major questions of choice respecting the appropriate auditing and accounting principles and practices, whether under Generally Accepted Accounting Principles or regulatory accounting principles, to be used in the preparation of the Company's audited financial statements.

2. The Corporate Governance Committee shall recommend to the Board candidates for directorships, have oversight responsibility for the evaluation of the Board, and have principal responsibility for recommending revisions to this Corporate Governance Plan. In particular, the Corporate Governance Committee shall:

    a. Periodically review the governance principles applicable to the Company;

    b. Prior to each Director's re-nomination, evaluate each Director based upon established Board Membership Criteria, and upon established Core Competencies, each as set forth in Section N. of this Corporate Governance Plan;

    c. Consider, in making its recommendations, candidates for directorships proposed by the Chief Executive Officer and, within the bounds of law and practicability, by any other senior executive officer or any Director or shareholder;

    d. Recommend to the Board the Director nominees to serve on Board Committees;

    e. Periodically review the size of the Board;

    f. Review the independence of all directors pursuant to the Independence Guidelines set forth in Section III A.1. of the Corporate Governance Plan; and

3. The Corporate Governance Committee also shall:

    a. have the ability to hire consultants, said costs of same being reasonable and customary;

    b. upon being constituted, review all contracts of officers of the Company, including but not limited to contracts issuing shares of stock or options to purchase shares of stock; provided that any termination of contracts of officers of the Company shall occur pursuant to majority vote of the Board;

    c. Review and recommend to the Board, the annual salary, bonus, stock options, and other benefits, direct and indirect, of the five highest-paid officers of the Company; provided, however, that shareholders shall be given the opportunity to vote on (i) all stock option plans, except for pre-existing plans (excluding any material amendments thereto), plans related to employment inducement or promotion options, option plans acquired in mergers or acquisitions, and tax qualified and excess benefit plans, as defined by the applicable NASDAQ or AMEX rules, unless a vote on such plans is otherwise required by law; and (ii) the issuance of any equity compensation to any executive who, at the time of such issuance, is one of the Company's five highest paid executives, unless executive compensation programs to determine whether they are appropriately coordinated; established and periodically review policies for the administration of executive compensation programs;

    d. Meet with the Chief Executive Officer to discuss the annual evaluation of the Chief Executive Officer's performance; and

    e. Review the provision in the by-laws concerning the percentage of shareholders required to call a special meeting, and, if deemed necessary, recommend to the Board a change or revision of such provision.

4. The appointment of the Independent Directors and the establishment of the Corporate Governance Committee shall not trigger any change of control provisions in any existing contract with the Company nor shall it trigger any provisions regarding payments to be made by the Company (termed "parachute" payments) in any contract with the Company.

## VII. REPORTING ON COMPLIANCE

Once a year during the five year period for which this Corporate Governance Plan is applicable, the Board shall submit a written report to Plaintiff's counsel in this Action confirming that the Company's Board has abided by all provisions of this Corporate Governance Plan

## VIII. COMPLIANCE WITH LAW

To the extent complying with any provision of this Corporate Governance Plan violates any governing law, regulation or rule, then such provision shall be deemed automatically superseded by such law, regulation or rule, and to the extent anything herein is more restrictive than the provisions of Sarbanes-Oxley or the rules and regulations promulgated thereunder, or the rules and regulations of the NASDAQ or AMEX exchanges if the Company secures a listing on one of those exchanges, then such provision shall be deemed automatically to conform and be identical therewith.

IX.  **GOVERNING LAW AND EXCLUSIVE REMEDY**

This Corporate Governance Plan shall be construed in accordance with Florida corporate law. Nothing in this Corporate Governance Plan shall be deemed to create a new or independent cause of action. Non-compliance with this Corporate Governance Plan may be remedied by injunctive relief in either form in which the D'Addario and Shuttle cases were filed, which, shall be the exclusive remedy pursuant to this Plan. Nothing herein shall be deemed to waive or abrogate any cause of action otherwise existing independent of this Plan.

Dated: November 2, 2005

STORCH AMINI & MUNVES PC

_____
Steven G. Storch
Counsel for Plaintiff

Dated: November 3, 2005

MCGUIRE WOODS LLP

_____
Robert W. McFarland
Counsel for Defendants Arnie Geller; Steven Couture, as Executor of the Estate of Gerald Couture

Dated: November 3rd, 2005

WILCOX & SAVAGE

_____
John S. Wilson
Counsel for R.M.S. Titanic, Inc. and Premier Exhibitions, Inc.

Dated: November 3, 2005

WILLIAMS SCHIFINO MANGIONE & STEADY, P.A.

_____
V. Stephen Cohen
Counsel for R.M.S. Titanic, Inc. and Premier Exhibitions, Inc.

13